IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

OREGON WILD,

        Plaintiff,

1:14-cv-00981-PA

    v.

**OPINION AND ORDER**

UNITED STATES FOREST SERVICE,

        Defendant.

_____

**PANNER, District Judge:**

This matter comes before the Court on cross motions for
summary judgment filed by Plaintiff Oregon Wild (#12) and
Defendant United States Forest Service ("the Forest Service")
(#15). Plaintiff's Motion for Summary Judgment (#12) is DENIED.
The Forest Service's Cross-Motion for Summary Judgment (#15) is
GRANTED.

1 - ORDER

**Background**

## I. The Bybee Project

Plaintiff challenges the Forest Service's authorization of the Bybee Vegetation Management Project ("the Bybee Project") located in the High Cascades Ranger District of the Rogue River-Siskiyou National Forest in Jackson County, Oregon. Administrative Record ("AR") 7214. The Bybee Project is a forest treatment project aimed at 1) improving stand conditions, diversity, density, and structure to increase forest resiliency and overall forest health; 2) providing for a sustainable supply of timber products; and 3) reducing the risk to forest resources from high intensity fire. AR 7222, 11584.

The Bybee Project planning area covers approximately 16,215 acres within the national forest. AR 7221. The project area is adjacent to Crater Lake National Park and Oregon Highway 230, also known as the Rogue-Umpqua Scenic Byway. AR 7222. Both the National Park and Oregon Highway 230 present serious fire risks. AR 7223. The heightened risk of fire stems from human activity, differing fire use standards between the National Park Service and the Forest Service, and the accumulation of fine fuels in the project areas along the park boundary and the highway.[1] AR 7223.

---

[1]Fine fuels, such as needles and small twigs, are "one of the best indicators of the risk of fire spread because small materials burn faster and spread fire more quickly than heavier fuels." AR 7223. The areas along the park boundary and along Oregon Highway 230 have approximately 7 tons of fine fuels per acre. AR 7223. The same areas "have abundant ladder fuels which can transfer wildland fire to the forest canopy. . . . leading to a loss of high quality habitat and other forest resources." AR 7224. In the project areas along the park boundary and Oregon

More than half of the project planning area has previously been used for timber harvest.  AR 7221.  34% of the project area contains overstocked timber stands.  AR 7223.

The Forest Service solicited and received public comments on the Bybee Project proposal beginning in April 2010.[2]  AR 7230.  In January 2013, the Forest Service issued an Environmental Assessment ("EA") for the Bybee Project.  AR 7214-509.  Plaintiff, along with a number of other interested parties, submitted comments to the Forest Service.  AR 8294-376.  On September 17, 2013, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("FONSI") for the Bybee Project.  AR 11584-600.  In response to public comments, the Forest Service adopted a modified alternative to its initial proposed action.  AR 11585-91.  The modified alternative adopted by the Forest Service scaled back the original Bybee Project proposal in a number of areas.  Id.

As approved, the Bybee Project permits commercial timber harvest of 2,021 acres on 45 units; 487 acres of precommerical thinning on 14 units; 236 acres of non-commercial thinning on parts of 27 units and 467 acres of natural fuels reduction treatments on 15 units.  AR 11585.  The project also includes the construction of 7.9 miles of temporary roads, largely on existing

---

Highway 230, the fuel reduction treatments would reduce fine fuels to 1.15 tons per acre.  AR 7225.

[2]The Forest Service solicited comments on the scope of the Bybee Project between April 2010 and June 2010 and received 780 comments.  The Forest Service also solicited public comments on the Bybee Project EA between January 2013 and February 2013. During that period, the agency received approximately 11,400 comments.  AR 11592.

3 - ORDER

non-system road templates, as well as decommissioning 5.4 miles of existing roads. Id. Decommissioning the temporary and existing roads will reduce the road density of the project area to a "low watershed risk category." AR 7315. The Bybee Project also includes post-harvest treatments, including soil restoration "to loosen detrimentally compacted soils (from previous management activity) [and] improve root growth, thereby increasing stand resiliency and health." AR 11586.

Plaintiff, as well as several timber industry parties, appealed the Forest Service's decision on the Bybee Project. AR 11821-964; 11965-73; 11974-77. The Forest Service denied the appeals in December 2013. AR 11980-12009. Plaintiff filed this action on June 18, 2014 (#1).

## II. The Gray Wolf

A number of Plaintiff's claims relate to the appearance of endangered gray wolves in the High Cascades Ranger District in the months following the Forest Service's final decision on Plaintiff's administrative appeal. In western Oregon, the grey wolf is listed as "endangered" under the Endangered Species Act. Mellgren Decl. Ex. A, at 2. A male wolf, known as OR-7, left his original pack in northeastern Oregon and has been tracked over several years by radio collar. Id. In 2011, OR-7 traveled through southern Oregon and into California before returning to Oregon and settling in the High Cascades Ranger District of the Rogue River-Siskiyou National Forest. Id. In May 2014, the U.S. Fish & Wildlife Service ("USFWS") informed the Forest Service that OR-7 had found a mate and produced a litter of at least two pups.

4 - ORDER

Id.  Because no wolves were known to be present in the Bybee
Project area during the project planning and comment periods,
neither the Forest Service or Plaintiff discussed the wolves at
the administrative stages of this case.

As of October 2014, the batteries on OR-7's radio collar were
failing and so the state and federal agencies are only able to
track his location intermittently.  Id.  The Oregon Department of
Fish & Wildlife planned to capture and collar one of the wolves.
Id.  The precise location of the wolves' den is being withheld by
the state and federal agencies to protect the endangered wolves,
but it is located more than 15 air miles from the Bybee Project
area.  Id. at 3.  OR-7 has not been tracked within 15 miles of the
Bybee Project area and all known locations for the wolves were 15
or more miles from the project area.  Id. at 2-3.

On October 10, 2014, after consultation with experts from
USFWS, the Forest Service issued a New Information Review.  The
Forest Service concluded that the appearance of the gray wolves
"does not constitute significant new information relevant to
environmental concerns regarding the Bybee project, and . . .
does not have a bearing on the authorized Bybee decision or its
impacts."  Id. at 3.  The Forest Service determined that no
supplemental environmental analysis was necessary.  Id.

## Legal Standard

### I. Summary Judgment Standards Do Not Apply

The parties have filed cross-motions for summary judgment
under Federal Rule of Civil Procedure 56.  The legal standards for
summary judgment motions are "inconsistent with the standards for

5 - ORDER

judicial review of agency action" under the Administrative

Procedure Act (APA).    <u>Olenhouse v. Commodity Credit Corp.</u>, 42

F.3d 1560, 1579 (10th Cir. 1994).    Nonetheless, the Ninth Circuit

endorsed summary judgment motions as "'an appropriate mechanism

for deciding the legal question of whether the agency could

reasonably have found the facts as it did.'" <u>City & Cnty. of San</u>

<u>Francisco v. United States</u>, 130 F.3d 873, 877 (9th Cir.

1997)(quoting <u>Occidental Eng'g Co. v. INS</u>, 753 F.2d 766, 770 (9th

Cir. 1985)).    As I have previously noted, I consider "summary

judgment" to be only a convenient label for the judicial review of

challenged agency actions.    <u>Oregon Wild v. Connaughton</u>, No. 1:12-

cv-2244-PA, 2014 WL 357084, at *1 (D. Or. Jan. 31, 2014).

## II. Judicial Review under the APA

Under the APA, the court determines whether the agency's

decisions was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."    5 U.S.C. § 706(2)(A).

Before a court may overturn an agency decision under the APA's

deferential standard of review,

> the court must consider whether the decision was based
> on a consideration of the relevant factors and whether
> there has been a clear error of judgment.    Although this
> inquiry into the facts is to be searching and careful,
> the ultimate standard of review is a narrow one.    The
> court is not empowered to substitute its judgment for
> that of the agency.

<u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 416

(1971)(citations omitted), <u>abrogated in part on other grounds</u>

<u>by</u> <u>Califano v. Sander</u>, 430 U.S. 99, 105 (1977).    This court

presumes the agency acted properly and affirms the agency when "'a

reasonable basis exists for its decision.'" <u>Nw. Ecosystem Alliance</u>

6 - ORDER

v. U.S. Fish & Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir.
2007)(quoting Independent Acceptance Co. v. California, 204 F.3d
1247, 1251 (9th Cir. 2000)(citations omitted)).

Review is limited to the question of whether the agency took
a "hard look" at the proposed action as required by a strict
reading of procedural requirements. Ctr. for Envtl. Law & Policy
v. U.S. Bureau of Reclamation, 655 F.3d 1000, 1005 (9th Cir.
2011)(quotation marks omitted). Courts defer to any agency
decision that is "fully informed and well-considered," but must
not overlook a "clear error of judgment." Id. (quotation marks
omitted). A court's deference when reviewing an agency's decision
"is highest when reviewing an agency's technical analyses and
judgments involving the evaluation of complex scientific data
within the agency's technical expertise." League of Wilderness
Defenders Blue Mountains Biodiversity Project v. Allen, 615 F.3d
1122, 1130 (9th Cir. 2010).

### Discussion

Plaintiff contends the Forest Service violated the National
Environmental Policy Act ("NEPA") and the National Forest
Management Act ("NFMA").

## I. NEPA

Plaintiff alleges that the Forest Service violated NEPA by
failing to prepare an Environmental Impact Statement ("EIS") for
the Bybee Project and also by failing to supplement the Bybee
Project Environmental Assessment ("EA") to account for the
appearance of endangered gray wolves in the area.

7 - ORDER

**A. Failure to Prepare an EIS**

NEPA is a procedural statute that does not mandate particular results, but rather sets forth a review process to "ensure that federal agencies take a hard look at the environmental consequences of the proposed action." Sierra Club v. Bosworth, 510 F.3d 1016, 1026 (9th Cir. 2007).  NEPA requires agencies considering "major Federal actions significantly affecting the quality of the human environment" to prepare an Environmental Impact Statement ("EIS").  42 U.S.C. § 4332(C).  To determine whether an EIS is required, an agency may first prepare a less extensive Environmental Assessment ("EA").  40 C.F.R. § 1501.4(b). If the EA finds that the proposed action will significantly affect the environment, the agency must prepare an EIS.  W. Watersheds Project v. Abbey, 719 F.3d 1035, 1050 (9th Cir. 2013).  If the proposed action is found to have no significant effect, the agency may issue a Finding of No Significant Impact ("FONSI"), "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant." Sierra Club, 510 F.3d at 1018 (quotation marks and citation omitted).

In determining whether the potential effects are significant, agencies and courts evaluate "both context and intensity."  40 C.F.R. § 1508.27.  In assessing intensity or "severity of impact," courts and agencies look at ten factors described in the federal regulation.[3]  40 C.F.R. § 1508.27(b).  A court may find a

---

[3]I discuss only the relevant factors in this opinion, but the full list of intensity factors is as follows:
    (1) Impacts that may be beneficial and adverse.  A significant effect may exist even if the Federal agency believes

substantial effect based on just one of the "intensity" factors.

Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 865

(9th Cir. 2004).  Even if no single factor justifies an EIS, the

factors may require an EIS when considered cumulatively.  Cascadia

Wildlands v. U.S. Forest Serv., 937 F. Supp. 2d 1271, 1283-84 (D.

Or. 2013)..

    In this case, Plaintiff challenges the Forest Service's Bybee

---

that on balance the effect will be beneficial.
    (2) The degree to which the proposed action affects public
health or safety.
    (3) Unique characteristics of the geographic area, such as
proximity to historic or cultural resources, park lands, prime
farmlands, wetlands, wild and scenic rivers, or ecologically
critical areas.
    (4) The degree to which the effects on the quality of the
human environment are likely to be highly controversial.
    (5) The degree to which the possible effects on the human
environment are highly uncertain or involve unique or unknown
risks.
    (6) The degree to which the action may establish a precedent
for future actions with significant effects or represents a
decision in principle about a future consideration.
    (7) Whether the action is related to other actions with
individually insignificant but cumulatively significant impacts.
Significance exists if it is reasonable to anticipate a
cumulatively significant impact on the environment.  Significance
cannot be avoided by terming an action temporary or by breaking
it down into small component parts.
    (8) The degree to which the action may adversely affect
districts, sites, highways, structures, or objects listed in or
eligible for listing in the National Register of Historic Places
or may cause loss or destruction of significant scientific,
cultural, or historic resources.
    (9) The degree to which the action may adversely affect an
endangered or threatened species or its habitat that has been
determined to be critical under the Endangered Species Act of
1973.
    (10) Whether the action threatens a violation of Federal,
State, or local law or requirements imposed for the protection of
the environment.
40 C.F.R. § 1508.27(b).

decision based on four of the § 1508.27(b) factors:[4] 1) the unique
characteristics of the geographic area (§ 1508.27(b)(3)); 2) the
degree to which the action represents a precedent for future
actions (§ 1508.27(b)(6)); 3) the degree to which the action may
affect an endangered species or its critical habitat (§
1508.27(b)(9)); and 4) the degree to which the action threatens a
violation of law (§ 1508.27(b)(10)).

### 1. Unique Characteristics of the Bybee Project Area

In assessing the "intensity" of a proposed action, agencies
are required to consider "[u]nique characteristics of the
geographic area, such as proximity to historic or cultural
resources, park lands, prime farmlands, wetlands, wild and scenic
rivers, or ecologically critical areas."  40 CFR § 1508.27(b)(3).
In this case, Plaintiff alleges that the Forest Service failed to
consider this factor with regard to 1) potential wilderness areas
(PWA) within the Bybee Project area; 2) Crater Lake National Park;
and 3) Oregon Highway 230.

### a. Potential Wilderness Areas

Plaintiff contends that the Forest Service failed to analyze
whether its decision to permit logging in PWAs in the Bybee
Project is environmentally significant.  Plaintiff contends that
the effect of the Bybee Project on PWAs required the preparation
of an EIS.

---

[4]Plaintiff originally challenged the decision not to prepare
an EIS on six "intensity" factors, but it has conceded its
arguments based on § 1508(b)(4) and (5).  I accept Plaintiff's
concession.

An agency is required to consider the environmental consequences of logging in roadless areas for two reasons: 1) roadless areas have certain attributes of independent environmental significance which must be analyzed, such as water resources, soils, wildlife habitat, and recreation opportunities; and 2) roadless areas are significant because of their potential for designation as wilderness areas under the Wilderness Act of 1964. Lands Council v. Martin, 529 F.3d 1219, 1230 (9th Cir. 2008). "The possibility of future wilderness classification triggers, at the very least, an obligation on the part of the agency to disclose the fact that development will affect a 5,000 acre roadless area or will affect an area of sufficient size as to make practicable its preservation and use in an unimpaired condition." Id. at 1231 (quotation marks and citation omitted).

> PWAs are not a land designation decision (does not change current land management allocations), they do not imply or impart any particular level of management direction or protection, they are not an evaluation of potential wilderness . . ., and they are not preliminary administrative recommendations for wilderness designation . . . . The inventory of PWAs does not change the administrative boundary of any [inventoried roadless area] or congressionally designated wilderness. The original designated management area (e.g., Matrix) would remain the land designation, even if areas in the project planning area meet the handbook criteria for PWAs.

AR 7376.

In this case, there are 2,693 acres of PWA on Forest Service land in the Bybee Project area.[5]  AR 7377.  The PWAs are broken

_____

[5]There are no wilderness areas or inventoried roadless areas within the Bybee Project area.  AR 7375-76.

into 10 distinct parcels, which range in size from 7 acres to 1,622 acres.  AR 7956.  The Forest Service PWAs are adjacent to 166,000 acres of PWA in Crater Lake National Park.[6]  AR 7377.  As ultimately adopted, the Bybee Project will affect approximately 403 acres of PWA, which the Forest Plan has designated as suitable for timber harvest.  AR 11587-88.

The Bybee EA included a 33-page appendix specifically addressing PWAs.  AR 7925-57.  The EA recognized that PWA which overlapped with treatment areas "would likely forego future designation as a wilderness."  AR 7379.  The Forest Service determined, however, that under the alternative ultimately adopted, the intensity of thinning on PWA would be "relatively light" and is not expected to leave "long term impacts on the landscape or create irreversible/irretrievable impacts to wilderness values."  AR 11593.

In light of the relatively small percentage of PWA acreage that will be affected by the Bybee Project, as well as the Forest Service's conclusion that the project will not create irreversible or irretrievable impacts on wilderness values, I conclude that the Forest Service reasonably decided that no EIS was required.

### b. Crater Lake National Park

Plaintiff contends that the potential impact of the Bybee

---

[6]The PWAs within the Bybee Project area met inventory criteria for PWAs because they were adjacent to the much larger proposed wilderness within Crater Lake National Park.  Any decrease in PWA acreage within the project area would not affect the eligibility of land within Crater Lake National Park.  AR 7377.

Project on adjacent land in Crater Lake National Park obligated the Forest Service to prepare an EIS.

Proximity of a project to an ecologically critical area, such as a national park, does not *per se* warrant the preparation of an EIS.  Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1162 (9th Cir. 1998).

In this case, the Bybee Project includes only National Forest System lands.  AR 7294.  As noted, however, the project area shares a boundary with Crater Lake National Park.  During the public comment period for the Bybee EA, the National Park Service expressed concerns about "potential consequences for the resources and visitor experience within [Crater Lake National Park]," and requested a formal consultation between the Park Service and the Forest Service.  AR 8161; 8210-23.  The Forest Service analyzed the effects of the Bybee Project on the park both within the EA itself and in response to comments.  AR 7384-7390; 11665-66; 11676; 11677.  Following the comment period, the Forest Service opted to scale back the Bybee Project near the park border.  AR 11585; 11587.  The free and precommercial thinning incorporated in the Bybee Project is expected to "benefit the area in the long term by reducing the stocking levels in overstocked stands, and reducing the heavy fuel loading that could lead to a stand-replacement fire that could affect both the Forest and Crater Lake National Park."  AR 11596.  Ultimately, the Forest Service concluded "that project effects will not cause significant effects to park resources nor will the project interfere with the

13 - ORDER

management responsibilities of the National Park Service." AR 11593.

On review of the record, I conclude that the Forest Service's decision not to prepare an EIS based on the proximity of the Bybee Project to Crater Lake National Park was rational.

### c. Oregon Highway 230

Plaintiff contends that proximity of the Bybee Project area to Oregon Highway 230, also known as the Rogue-Umpqua Scenic Byway, required the preparation of an EIS. As noted, mere proximity to an ecologically critical area does not require the preparation of an EIS. Presidio Golf Club, 155 F.3d at 1162.

The Bybee EA noted that Oregon Highway 230 is a an "area of concern for scenic quality." AR 7386. The highway is also a "high recreation use [area]" with "a risk of human caused fire." AR 7223. The Forest Service also noted that, without treatment, a fire that began along Oregon Highway 230 "would likely burn uphill into thick late successional vegetation with accumulated down woody material. A fire in this area would likely adversely affect these high value late successional resources." AR 7223. As noted, the Bybee Project is expected to substantially reduce the fire risk through fuel reduction treatments. AR 7225.

The Bybee EA noted that none of the proposed actions would "contribute additional adverse effects to these visually sensitive management areas." AR 7388. "[A]ll known cultural properties will be avoided during implementation" of the Bybee Project. AR 11598. The Forest Service consulted with the Oregon State

14 - ORDER

Historic Preservation Office, which concurred that the Bybee Project would have "no effects on significant cultural resource values." AR 11598.

I conclude that the Forest Service's decision not to prepare an EIS based on proximity to Oregon Highway 230 was rational.

### 2. Precedential Value of the Bybee EA

Agencies are required to consider "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6).

"EAs are usually highly specific to the project and the locale, thus creating no binding precedent." Barnes v. U.S. Dep't of Transp. 655 F.3d 1124, 1140-41 (9th Cir. 2011).

In this case, the Forest Service determined that the Bybee Project is

> similar in nature to actions undertaken on National Forest System lands and [does] not establish a precedent for future actions with significant effects, or represent a decision in principle with respect to future actions . . . . [I]t is evident that these actions are consistent with the Rogue River Forest Plan, as amended. Any future decisions will need to be considered in a separate analysis using relevant scientific and site-specific information available at that time.

AR 11597-98.

Plaintiff concedes that future projects that log in PWAs and other unroaded areas "will stand or fall on their own administrative record," but contends that the decision to permit logging and road construction nevertheless constitutes a potential precedent. Pl.'s Reply Br. 9. Plaintiff bases its claim on the

assertion that the Forest Service has never authorized timber harvesting on PWAs before.

The units at issue are designated for timber harvest under the Forest Plan.  AR 11685.  The Forest Service's decision is, therefore, consistent with the established designation of the land.  As noted, the timber harvest on the PWAs will be light and is not expected to leave "long terms impacts on the landscape or create irreversible/irretrievable impacts to wilderness values." AR 11593.  Given the limited scope of the Bybee Project, as well as the highly specific, non-binding nature of the EA, I conclude that the Forest Service rationally determined that no EIS was required.

### 3. Risks to Threatened or Endangered Species

Agencies are required to consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(9).

Plaintiff contends that the Bybee Project will adversely affect both the northern spotted owl and the gray wolf.

### a. Northern Spotted Owls

The northern spotted owl is an endangered species that can be found within the Rogue River-Siskiyou National Forest.  AR 11598. During the Bybee Project planning process, the Forest Service consulted with the U.S. Fish & Wildlife Service regarding the northern spotted owl.  At the time, the Bybee Project treatment units were are "coincident with 14 individual home ranges and/or

core areas of known (not estimated) spotted owl sites." AR 6906.

The Bybee Project does not include any removal of owl critical habitat. AR 6906, 11589. No "take" of individual owls is anticipated or permitted. AR 6914. USFWS concluded that the Bybee Project "may affect, and is not likely to adversely affect" the northern spotted owl. AR 6913. Agency biologists considered the cumulative effects of past, present, and reasonably foreseeable future actions and determined that "the Bybee Project is not expected to significantly cumulatively affect" spotted owl habitat. AR 11656-57. The habitat impacted by the Bybee Project "would be negligible and is not expected to affect the viability of the spotted owl within the analysis area." AR 11657. Nevertheless, the Forest Service ultimately deferred implementation of several Bybee Project units in order to "retain high value wildlife habitat within the home ranges of several spotted owls." AR 11585; 11589; 11598.

Plaintiff contends that the Forest Service and USFWS determination was based on the effects of the Bybee Project on the northern spotted owl as a species and that the agencies should have considered the effects of the project on individual owls. The Ninth Circuit has held, however, that "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." Envtl. Prot. Info. Ctr. v. U.S Forest Serv., 451 F.3d 1005, 1010-11 (9th Cir.

2006).[7]

I conclude that the Forest Service rationally determined that
no EIS was required based on potential adverse effects to the
northern spotted owl.

### b. Gray Wolves

In this case, the parties agree that no gray wolves were
known to be in the High Cascades Ranger District at the time of
the Bybee EA or the FONSI.  As of now, the Rogue River-Siskiyou
National Forest does not contain any gray wolf habitat that has
been determined to be critical.  Mellgren Decl. Ex. A, at 2.

In the context of 40 C.F.R. § 1508.27(b)(4), the Ninth
Circuit has held that challenges to agency decisions cannot be
based on *post hoc* controversies when was no substantial dispute at
the time of the agency's decision.  Greenpeace Action v. Franklin,
14 F.3d 1324, 1334 (9th Cir. 1992).  Although this holding is not
a perfect fit when applied to § 1508.27(b)(9), the underlying
rationale is sufficiently similar.  Plaintiff cannot explain how
the Forest Service could have acted arbitrarily and capriciously
in failing to consider the potential effects of the Bybee Project

---

[7]Plaintiff also cites this Court's recent decision in Oregon
Wild v. BLM, No. 6:14-cv-01100-AA, 2015 WL 1190131 (D. Or. Mar.
14, 2015).  In that case, the Court found that the project's
effects on the spotted owl, when considered cumulatively with the
other "intensity" factors, justified the preparation of an EIS.
Id. at *26.  Unlike the present case, however, Oregon Wild
involved the removal of 187 acres of owl critical habitat, which
led USFWS to conclude that the project would adversely affect the
spotted owl.  Id. at *24-25.  As noted, the present case involves
no removal of critical habitat and USFWS found that the Bybee
Project was not likely to adversely affect the northern spotted
owl.

on gray wolves when all parties agree that there *were no gray wolves in the area at the time of the decision*. The gray wolves' subsequent appearance in the High Cascades Ranger District and the Forest Service's response is more properly addressed in the context of Plaintiff's claims regarding supplemental NEPA analysis.

### 4. Threatened Violation of Law

As part of its NEPA analysis, an agency must consider "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10).

In this case, Plaintiff contends that the Bybee Project threatens a violation of NEPA by failing to prepare in EIS in the first instance and also by failing to supplement the Bybee EA following the appearance of the gray wolves in the High Cascades Ranger District. Plaintiff also asserts that the Bybee Project threatens a violation of NFMA. As discussed throughout this opinion, I find no violation of NEPA or NFMA. The Forest Service therefore rationally concluded that no EIS was required.

### B. Failure to Supplement the Bybee Project EA

Plaintiff contends that the Forest Service violated NEPA by failing to prepare a supplemental EA once it learned of the presence of the OR-7 pack in the High Cascades Ranger District.

In May 2014, USFWS and the Forest Service determined that OR-7 had located a mate, settled in the High Cascades Ranger District, and produced pups. On October 10, 2014, less than six

months after the discovery of the OR-7 pack and approximately four months after Plaintiff commenced this action, the Forest Service completed the Bybee Vegetation Management Environmental Assessment - New Information Review for Gray Wolves ("the New Information Review"), an inter-disciplinary, supplemental review of the Bybee Project.  Mellgren Decl. Ex. A.

The Forest Service determined that the appearance of the OR-7 pack was sufficient to warrant consideration and that it represented new information not considered in the Bybee EA. Mellgren Decl. Ex. A, at 2.  The Forest Service also determined that the information was potentially relevant, as both the Bybee Project and the OR-7 pack are located within the High Cascades Ranger District.  Id.

The Forest Service biologists determined that the Bybee Project will have no effect on the gray wolves.  Mellgren Decl. Ex. A, at 3.  In making that determination, the Forest Service noted that the wolves' den is over 15 air miles from the Bybee Project area and all known locations of the OR-7 pack were more than 15 miles from the project area.  Id. at 2-3. The Forest Service also conferred with USFWS biologists, who agreed that the Bybee Project would have no effect on the gray wolves.  Id. at 3. Accordingly, the Forest Service found that the appearance of the OR-7 pack was not substantial and no supplemental NEPA analysis was required.

### 1. Threshold Procedural Issues

"Persons challenging an agency's compliance with NEPA must

structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." Dep't of Transp. V. Public Citizen, 541 U.S. 752, 764 (2004)(quotation marks and citation omitted).

As noted, the Forest Service's New Information Review was issued less than six months after the discovery of the gray wolves and four months after Plaintiff initiated this action.  Plaintiff did not amend its complaint to include allegations regarding the New Information Review.  In its motion for summary judgment, Plaintiff contends that the New Information Review is arbitrary and capricious.[8]

The Forest Service argues that Plaintiff's challenge to the New Information Review is procedurally barred by Plaintiff's decision not to amend its complaint.[9]  The Forest Service also contends that Plaintiff failed to challenge the New Information Review at the administrative level.

---

[8]In its complaint, Plaintiff also claimed, in the alternative, that the Forest Service unlawfully withheld or unreasonably delayed its decision on a supplemental NEPA analysis in violation of 5 U.S.C. § 706(1).  Compl. 17.  Plaintiff has apparently abandoned this claim.

[9]In a footnote of its Reply brief, Plaintiff requests leave to amend its complaint, should the Court find amendment necessary.  Local Rule 7-1(b) forbids combining a motion with any response, reply, or other briefing.  Nor does the motion comply with the conferral requirements of Local Rule 7-1(a). Plaintiff's motion is not properly before the Court and I decline to consider it. See Harley-Davidson Credit Corp. V. Turudic, No. 3:11-cv-01317-HZ, 2012 WL 5411771, at *1 (D. Or. Nov. 6, 2012).

21- ORDER

While it may be that Plaintiff should have challenged the Forest Service's decision not to supplement their NEPA analysis at the administrative level, or, at the very least, should have amended their complaint, the fact remains that the Forest Service has now completed its review and issued its decision. I turn now to Plaintiff's substantive challenge to that decision.

### 2. The New Information Review

NEPA requires agencies to supplement a NEPA analysis in response to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). Supplementation is not required every time new information comes to light after the EIS is finalized because "[t]o require otherwise would render agency decisionmaking intractable, always awaiting updated information." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 373 (1989).

An agency's decision not to prepare a supplemental NEPA analysis "may be overturned only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Cold Mountain v. Graber, 375 F.3d 884, 892 (9th Cir. 2004). "Whether new information requires supplemental analysis is a 'classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" Tri-Valley CAREs v. U.S. Dep't of Energy, 671 F.3d 1113, 1130 (9th Cir. 2012)(quoting Marsh, 490 U.S. at 376).

22 – ORDER

In this case, the New Information Review determined that the appearance of the OR-7 wolf pack was new information. Mellgren Decl. Ex. A, at 2. The presence of the wolves in the High Cascades Ranger District made the information potentially relevant to the Bybee Project. Id. Accordingly, the Forest Service undertook a review of potential impacts on the gray wolves by the Bybee Project. Id. at 3. As part of its review, the Forest Service biologists consulted with biologists from USFWS. Id. Both the Forest Service and USFWS determined that the Bybee Project would have no effect on the OR-7 wolves, noting that all known wolf locations, as well as the wolf den, are fifteen miles or more from the project area. Id. at 2-3. Based on the opinions of its own biologists, as well as those of USFWS, the Forest Service concluded that the appearance of the gray wolves did not constitute significant new information relevant to environmental concerns regarding the Bybee Project. Id. at 3. Accordingly, the Forest Service determined that no supplemental NEPA analysis was necessary. Id.

Plaintiff argues that the Forest Service should have made a decision on supplemental NEPA analysis before Plaintiff filed this action. I note that Plaintiff filed this action approximately one month after the presence of the OR-7 wolf pack was discovered. The New Information Review was completed less than six months after the discovery of the OR-7 pack. Under the circumstances, the Forest Service undertook and completed its review promptly.

Turning to the New Information Review itself, I conclude that the Forest Service's decision was not arbitrary and capricious. As noted, the question of whether an agency is required to supplement its NEPA analysis implicates agency expertise.  Because Plaintiff decided not to amend its complaint to include allegations regarding the New Information Review, the Forest Service has not filed an administrative record for that decision. Nevertheless, the New Information Review and the supporting declaration filed by the Forest Service (#18) make it clear that the Forest Service based its decision on the advice and opinions of its own scientists, as well as those of USFWS.  Of particular note, it is uncontroverted that there is no designated critical wolf habitat in the Rogue River-Siskiyou National Forest. Similarly, it is undisputed that all known gray wolf activity has occurred fifteen miles or more from the project area.  I conclude that the Forest Service took a "hard look" at the new information. The Forest Service's decision not to prepare a supplemental NEPA analysis was not arbitrary or capricious.

## II. NFMA

The National Forest Management Act, 16 U.S.C. § 1600 *et seq.*, establishes both procedural and substantive requirements for the management of National Forest System lands.  Under NFMA, the Forest Service is required to develop a Land and Resource Management Plan ("LRMP"), also known as a Forest Plan, which sets forth broad, long-term planning for an entire national forest.

24 - ORDER

Any site-specific projects approved by the Forest Service must be consistent with the Forest Plan. <u>Great Old Broads for Wilderness v. Kimbell</u>, 709 F.3d 836, 851 (9th Cir. 2013). The Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference. <u>Id.</u> at 850; <u>Native Ecosystems Council v. Weldon</u>, 697 F.3d 1043, 1056 (9th Cir. 2012). "Agency decisions challenged under NFMA may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not inaccordance with the law." <u>Native Ecosystems Council</u>, 697 F.3d at 1056.

Plaintiff alleges that the Forest Service violated NFMA by authorizing timber harvests and roadbuilding on soils that already exceed Forest Plan requirements for the protection of soil resources.

In this case, the relevant Forest Plan is the Rogue River National Forest Land and Resource Management Plan. AR 1347. The Forest Plan provides that "No more than 10 percent of an activity area should be compacted, puddled or displaced upon completion of project (not including permanent roads or landings). No more than 20 percent of the area should be displaced or compacted under circumstances resulting from previous management practices including roads and landings." AR 1417.

Within the Bybee Project, 21 units have detrimental soil conditions that already exceed the 20% threshold prior to project implementation. AR 7628-31. None of the 21 units at issue are

expected to suffer a net increase in soil disturbance as a result of the project.  Id.  The Bybee Project will combine silvicultural treatment with subsoiling, a restoration and rehabilitation practice aimed at improving deep root growth over time, ultimately improving stand resiliency and health.  AR 7644; 11588.  Other mitigation measures include consultation with a soil scientist during project planning, AR 11615, and the presence of an on-site Forest Service soil scientist during implementation "to ensure that proper mitigation measures and soil restoration actions are applied."  AR 11588.

The Forest Plan does not directly address the issue of what standard should apply when prior activities have already resulted in soil disturbance in excess of 20%.  The Forest Plan provides, however, that its standards and guidelines "supplement, but do not replace, direction from Forest Service Manuals, Handbooks, and the Regional Guide for the Pacific Northwest Region."  AR 1407.  The relevant Forest Service Manual provides that "In areas where more than 20 percent detrimental soil conditions exist from prior activities, the cumulative detrimental effects from project implementation and restoration must, at a minimum, not exceed the conditions prior to the planned activity and should move towards a net improvement in soil quality."  SUPP 002 (#13-1); AR 7644.

The Ninth Circuit confronted a similar situation in Hapner v. Tidwell, 621 F.3d 1239, 1246-47 (9th Cir. 2010).  In that case, the applicable standards prohibited logging that resulted in more

than 15% detrimental soil disturbance in affected areas.[10]  Id. at
1246.  Where the soil disturbance already exceeded 15% from prior
activities, harvesting was permissible so long as it did not
result in a net increase in soil disturbance.  Id.  In Hapner, as
in this case, the Forest Service planned to implement soil
restoration measures so that the project area would not suffer a
net increase in soil disturbance.  Id. at 1247.  The Ninth Circuit
held that the Forest Service did not violate NFMA when it
concluded that its mitigation measures would prevent a net
increase in soil disturbance.  Id.

     In this case, the Forest Service's decision to look to the
Forest Service Manual for the applicable standard on management
activities on sites that already exceeded the Forest Plan
threshold was reasonable in light of the Forest Plan's express
incorporation of Forest Service Manual standards.  As in Hapner,
the Forest Service had provided for mitigation measures to prevent
a net increase in soil disturbance.

     Plaintiff disputes the efficacy of subsoiling as a
restoration method.  The record indicates that subsoiling is not a
universally effective form of soil restoration and certain soil
conditions can limit or negate its benefits.  AR 6513; 6515; 7625;
11612.  Subsoiling has, however "been used with success on the

---

[10]In Hapner, the applicable Forest Plan did not provide
specific standards for soil disturbance.  The Forest Service
therefore looked to the Northern Region Soil Quality Standard.
Hapner, 621 F.3d at 1246.

27 - ORDER

High Cascades Ranger District for soil restoration, where historic
management methods created detrimental compaction." AR 7625; see
also AR 11588 ("Implementation and effectiveness monitoring on
other similar projects in the areas have shown this method of soil
restoration to be effective."). The record also indicates that
the Forest Service is aware of the limitations of subsoiling and,
accordingly, provided that a Forest Service soil scientist would
be on site during implementation to ensure that the Bybee Project
does not result in a net increase in soil disturbance. AR 6515;
11588. The efficacy of the mitigation measures is the sort of
technical, scientific question in which the agency is entitled to
substantial deference. Accordingly, I defer to the Forest
Service's determination that the mitigation measures to be
implemented in the Bybee Project will prevent a net increase in
soil disturbance.

I conclude that the Forest Service's decision to implement
the Bybee Project is not arbitrary or capricious and does not
violate NFMA.

## Conclusion

Plaintiff's Motion for Summary Judgement (#12) is DENIED.

The Forest Service's Motion for Summary Judgment (#15) is GRANTED.

Judgment is for Defendant Forest Service.


DATED this __29__ day of May, 2015.


OWEN M. PANNER
U.S. DISTRICT JUDGE

## **Conclusion**

Plaintiff's Motion for Summary Judgement (#12) is DENIED.

The Forest Service's Motion for Summary Judgment (#15) is GRANTED.

Judgment is for Defendant Forest Service.


DATED this __29__ day of May, 2015.


OWEN M. PANNER
U.S. DISTRICT JUDGE

28 - ORDER